**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RASHAWN ARNOLD,

      Plaintiff,                             Case No.: 05-70191

v.                                      Hon.: Lawrence P. Zatkoff

SERGIO GARCIA and
CITY OF JACKSON, Jointly
and Severally and in their
Individual Capacities,

      Defendants.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on August 9, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment (Docket #18).

Plaintiff has filed a response, and Defendants have filed a reply brief. In addition, Plaintiff has

since filed a Motion for Leave to File a Supplemental Brief in Response to Defendants' Motion for

Summary Judgment ("Supplemental Brief Motion") (Docket #31). Defendants have filed a response

to the Supplemental Brief Motion. The Court finds that the facts and legal arguments pertinent to

Defendants' Motion for Summary Judgment and Plaintiffs' Supplemental Brief Motion are

adequately presented in the parties' papers, and the decisional process will not be aided by oral

arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the

Motions be resolved on the briefs submitted, without this Court entertaining oral arguments.  For the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and Plaintiff's Supplemental Brief Motion is GRANTED.


## II.  BACKGROUND

This case stems from the arrest and detention of Rashawn Arnold (hereinafter "Plaintiff"), and the subsequent search of her apartment by defendant Sergio Garcia (hereinafter "Garcia") on or about March 25, 2004. Plaintiff claims that she has sustained: physical injuries (bruising to one of her arms); pain, suffering and emotional distress; injuries to her reputation; post-traumatic stress disorder; anxiety and depression; humiliation, mortification and embarrassment; and other injuries, damages and/or consequences.

**A.      Relevant History Prior to Incident**

On March 25, 2004, Plaintiff was 31 years old and lived in an apartment on 308 Van Buren St., Jackson, Michigan, with her minor son, London. At that time, Plaintiff dated Glasper Truman ("Truman"), but they maintained separate residences.  On the same date, Garcia, an officer for the City of Jackson Police Department working as part of the Jackson Narcotics Enforcement Team ("JNET"), initiated an investigation of Truman and his home on 167 West Addison, Jackson, Michigan, after receiving a tip from a confidential informant.  Garcia and Deputy Schutte conducted 20 minutes of surveillance outside Truman's home.  During that time, they observed approximately five vehicles arrive and depart from the location.  Shortly thereafter, Garcia ordered a stop on a blue Oldsmobile in which Truman was riding.  Royce Rogers was the owner and driver of the vehicle, and Truman was sitting the front passenger's seat.  After the stop, Garcia searched Truman but did

2

not find any drugs or contraband.  Deputy Schuette located a pill bottle on the floor behind the driver's seat containing a powdery substance, which the officers believed to be crack cocaine.  Mr. Rogers stated that the pill bottle did not belong to him, that he had cleaned out the car earlier that day, and that Truman was the only other person who had been in the car that day.

The officers arrested Truman and Deputy Schutte secured a search warrant on behalf of Garcia (the designated Officer-in-Charge of the case) authorizing the search of Truman's home. Garcia and fellow JNET officers entered and searched Truman's home at approximately 8:15 p.m. During the search, officers found marijuana and cocaine, for which Truman was later charged. Sometime between 8:00 pm and 9:00 pm on March 25, 2004, Plaintiff learned of the raid on Truman's home and drove to that location with her cousin, Shena Nuels.  At this point, the stories of the Plaintiff and Defendants diverge significantly.

**B.      Plaintiff's Version**

Upon her arrival at Truman's home, Plaintiff spoke with Garcia and told him that she was Truman's girlfriend.  Garcia informed Plaintiff that he was going to search her apartment next because Truman was cooperating and told the police that there were narcotics in Plaintiff's home. Plaintiff claims that she informed Garcia that there were no drugs inside her apartment and told Garcia that he would have to get a warrant to search her apartment.  Garcia had no information other than Truman's statements that there were drugs at Plaintiff's apartment.  Garcia had no other knowledge of Plaintiff or her residence, and had never been involved in, or received any, information regarding surveillance or drug trafficking activities related to Plaintiff or her residence.

Plaintiff and Ms. Nuels left Truman's residence and drove to Plaintiff's apartment to pick up clothing and her son's school books for the next day.  Plaintiff and Ms. Nuels were at the

3

apartment for approximately five minutes.  As soon as Plaintiff and Ms. Nuels exited the apartment,

Officer Timothy Hibbard of the Jackson Police Department stopped them, forcefully grabbed hold

of their arms, and informed them that they were not allowed leave the premises.  When Plaintiff and

Ms. Nuels inquired as to why they were not free to leave, Officer Hibbard indicated that he received

instructions (from Garcia) not to allow anyone to enter or exit the apartment.

Shortly after Officer Hibbard detained Plaintiff and Ms. Nuels, Garcia arrived at Plaintiff's

apartment with additional officers. Upon Garcia's request, Plaintiff allowed Garcia to search her

bags and her purse.  Plaintiff believed that, once Garcia saw that she did not have any contraband,

she would be free to leave.  Garcia's search of Plaintiff's belongings yielded only children's clothing

and no narcotics or contraband of any kind.

After Garcia failed to locate any contraband on Plaintiff or Ms. Nuels, Plaintiff asked Garcia

to stop harassing her and to simply allow her to leave.  In response, Garcia began demanding that

Plaintiff allow him and the other officers to search her apartment. Plaintiff refused to allow them to

enter her apartment and replied that she would not consent to a search of her apartment without a

search warrant.  Garcia repeatedly stated that if she did not give consent for the search and open her

apartment door to allow the officers inside, she would be jailed.  Garcia stated numerous times that

he believed Plaintiff was holding narcotics in the residence and that if he were forced to seek a

search warrant, any narcotics located would result in criminal charges being filed against her.

Defendant further stated that, if she were she to cooperate and grant consent to search, she would

not be held responsible for any narcotics found on the premises.  Despite Garcia's persistent

demands, Plaintiff continued to deny access to her apartment, and Garcia arrested Plaintiff for

disorderly conduct.  In doing so, Garcia grabbed Plaintiff's arms, twisted them behind her back, and

4

forced her to the ground.  The amount of force Garcia used caused bruises to Plaintiff's left arm.

During the incident, Kelly Click, a neighbor from an adjacent apartment, opened her door to find out what the commotion was about and saw Plaintiff handcuffed on the ground and sobbing hysterically.  Ms. Nuels  yelled a phone number to Ms. Click (the number for Mark Arnold, Plaintiff's father) to alert Mr. Arnold (who did not live with Plaintiff) of what was happening. Garcia then ordered Ms. Click to lock her door and turn her TV volume up.  After Garcia handcuffed Plaintiff, Ms. Nuels made several attempts to persuade Garcia to remove Plaintiff's handcuffs and allow them to leave.  In response, Garcia repeatedly stated that he needed to get into Plaintiff's apartment because he "knew there was something in there" and that "if [Plaintiff] was willing to let them in [the apartment,] they would put nothing on her, but he would have no choice but to [charge] her if he went in there with a search warrant." After approximately 20 minutes of Ms. Nuels' unsuccessful efforts to persuade Garcia to free Plaintiff, Mr. Arnold arrived at the location.

When Mr. Arnold arrived, Plaintiff was still sitting on the hallway floor with her hands cuffed behind her back.  Garcia then attempted to convince Mr. Arnold to force his daughter to consent to the search. Specifically, Garcia wanted Mr. Arnold to convince Plaintiff to let him search her apartment because it would be laborious to have to go and get a search warrant.  Further, if Plaintiff did not cooperate, Defendant would not "protect her from whatever he found in her apartment...."  At that point, Mr. Arnold walked over to Plaintiff and attempted to persuade her to allow the officers into her residence. Plaintiff told her father she had no drugs in the apartment, had done nothing wrong, and was embarrassed and upset about what was happening to her.  After approximately 15 to 20 minutes of conversation between Mr. Arnold, Garcia and Plaintiff, Garcia finally removed Plaintiff's handcuffs and used Plaintiff's key to enter her apartment. Plaintiff states

5

that she never told Garcia (or any other officers) that they could search the apartment.  Ms. Nuels and Mr. Arnold  testified that they never saw or heard Plaintiff tell Garcia or his fellow officers that they could search the apartment. Plaintiff also stated that she never told her father, Mr. Arnold, that he could tell the police that they could enter her apartment.  Garcia unlocked the apartment door with Plaintiff's key and walked inside. Garcia and other officers then searched Plaintiff's apartment for approximately 20 to 30 minutes.  No narcotics, contraband, or illegal artifacts or any kind were discovered in Plaintiff's residence.

After the search ended, Garcia released Plaintiff, and he and the other officers left the premises.  No charges of any kind were filed against Plaintiff with respect to any of the events of March 25, 2004.  As a result of this incident, Plaintiff claims she has suffered extreme embarrassment and humiliation and that she was so mortified by the incident she felt compelled to move from the apartment complex due to the fact that neighbors had witnessed the event.  Plaintiff was also very concerned that she would be fired if her employer learned of the incident.  Plaintiff sought treatment for stress following the event and was placed on anti-depression medication.  This stress was compounded by the fact that Plaintiff had suffered a previous miscarriage, and she became concerned that the anxiety she was suffering as a result of this incident would result in another one.

## C.   Defendants' Version

When Plaintiff arrived at Truman's home, Garcia told Plaintiff that the informant had indicated that she was holding drugs at her residence for Truman.  Garcia told her that he did not want her to get into trouble for anything that Truman was doing.  Garcia asked for consent to search Plaintiff's apartment. He testified that she told him that she would allow him to search the

apartment, but that she needed to pick up her child first. She then left the Truman residence. Garcia contacted Officer Hibbard. He asked Officer Hibbard to go to Plaintiff's residence to determine whether anyone went to the apartment before he arrived. Officer Hibbard went to the residence. Plaintiff and Ms. Nuels were inside. When they walked out of the apartment, Officer Hibbard told them that they needed to wait for Garcia to arrive. Officer Hibbard contacted Garcia and told him that Plaintiff was at the apartment. Garcia arrived shortly thereafter.

At that point, based upon his previous discussion with Plaintiff, Garcia still thought that she would allow him to go forward with the search of her apartment. As Garcia approached Plaintiff, she was in the hallway, just outside of her apartment. He recalls that her cousin, Ms. Nuels, was with her. Plaintiff was carrying clothing. He asked to search the clothing and she allowed him to do so. Garcia testified that, during this search, Plaintiff became belligerent and started screaming and swearing at him. At that point, Garcia and Officer Hibbard placed Plaintiff under arrest for disorderly conduct. They handcuffed her. Garcia held her right arm and Officer Hibbard held her left arm during the cuffing process, then sat her down on the floor.

During the course of Plaintiff's disorderly conduct, swearing and screaming, Ms. Click opened her apartment door. Plaintiff's screaming woke up Ms. Click's small child, and Ms. Click opened the apartment door to see what the disturbance was. Either Plaintiff or Ms. Nuels called out a telephone number to Ms. Click. A short period later, Mr. Arnold appeared at the apartment, and Garcia spoke to him. Mr. Arnold then went to speak with his daughter. Mr. Arnold has testified that "I know she gave her consent (to search her apartment) because I convinced her to...I just don't remember if I was standing there when she did...I know it was done." Garcia testified that Plaintiff gave him consent to search the apartment. Garcia proceeded to search the apartment. The search

of the apartment took approximately 5-10 minutes. No drugs were found.  During the search of the

apartment, Garcia says Plaintiff did not make any statements to the officers objecting to the search.

**D.      Procedural History**

Plaintiff filed her Complaint with this Court on January 19, 2005, alleging the following

violations of state and federal law: (1) Garcia's actions constituted a false arrest of Plaintiff; (2)

Garcia arrested Plaintiff without probable cause in violation of her Fourth Amendment right to be

free from unreasonable seizures of her person; (3) Garcia unlawfully searched Plaintiff's residence

in violation of her Fourth Amendment right to be free from unreasonable searches; and (4) defendant

City of Jackson (the "City") violated her constitutional rights.  The Court dismissed Plaintiff's state

law false arrest claim. Defendants now moves for summary judgment with respect to Plaintiff's

remaining claims.

In addition, Plaintiff filed a Motion to Compel when Defendants failed to answer Plaintiff's

Second Request for Production of Documents.  In essence, Plaintiff sought "a complete copy of the

personnel file of Sergio Garcia from the City of Jackson Police Department."  Several months later

(and after the briefs on summary judgment had been filed), the Court granted Plaintiff's Motion to

Compel.  Defendants then provided Plaintiff with the requested records on April 20, 2006, in

conformity with the Court's Order.  On June 22, 2006, Plaintiff filed her Supplemental Brief Motion.

### III.  STANDARDS OF REVIEW

**A.      Rule 12(b)(6) - Failure to State a Claim**

A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which

relief can be granted tests the legal sufficiency of the plaintiff's complaint. The Court must accept

as true all factual allegations in the complaint, and any ambiguities must be resolved in the plaintiff's favor. *Jackson v. Richards Medical Co.*, 961 F.2d 575, 577 (6th Cir. 1992). A district court's grant of a motion to dismiss is proper when there is no set of facts that would allow the plaintiff to recover. *Carter by Carter v. Cornwall*, 983 F.2d 52, 54 (6th Cir. 1993).

**B.      Rule 56 - Summary Judgment**

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the

motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v.*
*Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. ANALYSIS

**A.      Supplemental Brief Motion**

Plaintiff filed the Supplemental Brief Motion to "buttress and enhance her earlier response
to summary judgment which was . . . filed before" receiving the documents in Garcia's personnel
file. Defendants' sole objection to the Supplemental Brief Motion is that it was untimely filed two
months after Plaintiff received the personnel file. Although the Court is equally perplexed by the
Plaintiff's delay in filing the Supplemental Brief Motion, the Court finds that the interests of justice
dictate that such Supplemental Brief Motion be filed and considered by this Court.

First, the prejudice Defendants allude to in their objection is no more than an objection to
the Supplemental Brief Motion being filed two months after receiving Garcia's personnel file.
Defendants do not cite any actual prejudice. The Court notes, however, that Plaintiff did not receive
Garcia's personnel file until about five months after requesting it and three months after the time by
which Plaintiff had to file her response to Defendants' Motion for Summary Judgment. As such,
Plaintiff could not have addressed the information that was subject to the Motion to Compel in her
initial response brief and any argument would have been made in an "untimely" manner. The Court
does not find that the interests of justice weigh in favor of Defendants for failing to produce
discovery in a timely manner. Second, the subject matter of the Supplemental Brief Motion is
limited to arguments based on the information contained in the personnel file received by Plaintiff
pursuant to the Motion to Compel. Plaintiff does not attempt to supplement any of the other

arguments set forth in her initial response brief.

For the foregoing reasons, Plaintiff's Motion for Leave to File a Supplemental Brief is GRANTED. The Court shall consider the arguments set forth in Plaintiff's Brief in support of the Supplemental Brief Motion when discussing the Plaintiff's claim against the City, in Section IV.D. below.

## B.   42 U.S.C. §1983 Claims

Plaintiff claims that she sustained physical injuries during her arrest by Garcia. Defendants assert that Plaintiff has failed to establish a valid claim pursuant to 42 U.S.C. §1983. Section 1983 "is not itself a source of substantive rights; but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-394 (1989). In order to successfully state a claim under § 1983, a plaintiff must show that he or she was deprived of a right "'secured by the Constitution and the laws' of the United States" by one acting under color of law. *Ahlers v. Schebil*, 188 F.3d 365, 370 (1999) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-56 (1978)). In *Graham,* the Supreme Court held that the reasonableness or unreasonableness of force used by police during an arrest must be analyzed as a Fourth Amendment claim rather than under "the more generalized notion of 'substantive due process.'" *Graham,* 490 U.S. at 394-95. The question is whether the Garcia's actions were objectively reasonable, in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *Graham,* 490 U.S. at 399.

### 1.   *"Detainment" by Officer Hibbard*

Plaintiff's Complaint and Response Brief imply that Garcia "detained" her first when he directed Officer Hibbard to prevent any persons from entering or leaving Plaintiff's apartment.

11

The Court finds that such "detainment" is objectively reasonable under the facts of this case, even taken in a light most favorable to Plaintiff.  Garcia had probable cause to believe that there were drugs in her apartment based on the statements of informant.  In addition, Garcia had told Plaintiff of the informant's statements and that he (Garcia) desired to search her apartment for the alleged drugs.  Therefore, even if Plaintiff had refused to give Garcia consent to search her apartment at that time, his decision to have an officer stop persons attempting to enter into or exit from the apartment where the alleged contraband was located was supported by probable cause.  Moreover, Plaintiff has not alleged or argued that Officer Hibbard's detainment of her involved unreasonable force.

For the foregoing reasons, the Court finds, as a matter of law, that Garcia had probable cause to detain Plaintiff when she exited her apartment and that no unreasonable force was used to do so.  Accordingly, Defendants' motion for summary judgment is granted with respect to any claim that the detainment of Plaintiff by Officer Hibbard violated her constitutional rights.

   2.   *Arrest for Disorderly Conduct*

Defendants contend that because Plaintiff became disorderly when Garcia was searching her belongings, Garcia acted entirely appropriately (*i.e.*, objectively reasonable) in arresting her and placing her in handcuffs.  Plaintiff's version of the facts leading up to her arrest, however, differ greatly from that asserted by Garcia.  Plaintiff maintains she was compliant with Garcia when he asked if he could search her purse and bags in the apartment hallway.  Plaintiff states that once Garcia conducted the search of her belongings and found nothing, she indicated her desire to leave and get her son.  She testified that she did not raise her voice beyond that of Garcia, notwithstanding his repeated requests and demands that she allow him to search the apartment and refusal to let her leave.

12

Defendants rely on the testimony of Ms. Click, Plaintiff's neighbor, that Plaintiff "was screaming in the hallway ... so loud that she woke up the baby" as conclusive evidence that Plaintiff was being disorderly. It is not clear from Ms. Click's testimony, however, whether Plaintiff's screaming precipitated her arrest or was the result of her arrest. Ms. Click testified that Plaintiff already was in handcuffs and on the floor when Ms. Click first opened her door. In addition, the testimony of Ms. Nuels was that Plaintiff did not yell, scream, or swear at the officers before she was handcuffed.

For the foregoing reasons, the Court finds that there is a genuine issue of material fact as to whether Garcia had probable cause to arrest Plaintiff for disorderly conduct. As Plaintiff allegedly suffered injuries as a result of the arrest (and Defendants do not contest the injuries in their motion), Plaintiff has produced evidence that would demonstrate that Garcia's use of force in arresting her was unreasonable.

   3.   *Search of Plaintiff's Apartment*

Defendants next assert that there is no evidence to support Plaintiff's claim that the search of her apartment by Garcia was without consent. Defendants note that Garcia testified that Plaintiff consented to the search. Defendants assert that following her handcuffing, Plaintiff subsequently calmed down. Then, after discussions between Plaintiff and her father and conversations between Plaintiff and Garcia, Defendants contend Plaintiff consented to the search of her apartment. Defendants also rely on the testimony of Mr. Arnold, who stated that "I know that she gave her consent because I convinced her to. ... I know that it was done." Finally, Defendants contend that Plaintiff did not object to the search of her apartment from the time she gave Garcia consent to do so outside of her apartment until the search was completed. Defendants again point

13

to the testimony of Mr. Arnold in support of their position:

> Q.:   While the officers were inside the apartment searching the
> apartment your daughter Rashawn Arnold didn't say to any
> of the officers that they shouldn't be in there searching the
> apartment, or anything along those lines, did she?
>
> A.:   Not that I remember.

As such, Defendants assert that Garcia's actions were objectively reasonable and appropriate.

Plaintiff argues that a genuine issue of material fact exists as to whether Plaintiff consented to the search of her apartment.  The Court agrees.  Although Garcia testified that Plaintiff gave him consent to search her residence (both at Truman's house and at Plaintiff's apartment), Plaintiff denies that such consent was given at either location.  No other witness (including Mr. Arnold) has testified that he or she actually heard Plaintiff give (or refuse to give) Garcia such consent.

In addition to the conflicting statements of the parties, there is a genuine issue of material fact as to whether valid consent (if any) to the search was obtained.  Valid consent exists only when it is "'unequivocally, specifically, and intelligently given,'" and it must be "uncontaminated by duress, coercion, or trickery." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (internal citation omitted); *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981).  Under the Fourth Amendment, consent must be given voluntarily. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). "[T]he question of whether a consent to a search was in fact voluntary or was a product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

In determining whether an individual gave her consent to search, the following factors should be considered: (1) whether the consenting person was in custody; (2) whether the officers' guns were drawn; (3) whether the person was told she had the right to refuse a request to search; (4) whether

14

the person was told she was free to leave; (5) whether *Miranda* warnings were given; and (6) whether the person was told a search warrant could be obtained. *Robinette,* 519 U.S. at 39-40. Other factors for a court to consider include whether the suspect was threatened with detention if he or she refused to consent, and whether the suspect assisted in the search. *United States v. Williams*, 754 F.2d 672, 674 (6th Cir. 1992).

In this case, there is evidence to support finding that a majority of the *Robinette* factors weigh in Plaintiff's favor. First, it is undisputed that Plaintiff was "in custody" where she was not allowed to leave the premises and was handcuffed and placed on the ground in the hallway outside her door. Second, although there is no evidence of the officers' guns being drawn, there is evidence indicating that Garcia and other officers had physical control of Plaintiff since they grabbed her by her arms and had her in cuffs. Third, Plaintiff has testified that she was never informed by either Garcia or any other officer that she had the right to refuse their request to search her apartment. Fourth, there is undisputed evidence that neither Garcia nor any other officer informed Plaintiff that she was free to leave. Fifth, there is evidence that no *Miranda* warnings were never given to Plaintiff despite the fact that she was handcuffed and arrested in the hallway. The evidence appears to be uncontroverted that Garcia told Plaintiff that a search warrant could be obtained, but there is evidence to support a finding that Plaintiff also satisfies the *Williams* factors in that Garcia threatened her with jail if she did not allow him to search her residence. Finally, there is no suggestion that exigent circumstances justify the search of Plaintiff's apartment.

For the reasons discussed above, the Court finds that there is a genuine issue of material fact as to whether Garcia's search of Plaintiff's apartment was valid.

C.     **Qualified Immunity**

The qualified immunity doctrine provides that government officials performing discretionary actions are shielded from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)*; Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999). The Supreme Court has repeatedly held that the ultimate burden of proof is on the plaintiff to show that defendants are not entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). *See also Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991)*, cert. denied,* 113 S. Ct. 1848 (1993)*.*

In *Hunter* v. *Bryant*, 502 U.S. 224, 227-28 (1991) (citations omitted)*,* the Supreme Court stated:

> First, . . . *immunity ordinarily should be decided by the court [and not the jury] long before trial.* Second, the court should ask whether the agent acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the event can be construed five years after the fact.

"Although the Fourth Amendment 'reasonableness' inquiry is largely fact-driven, summary judgment for defendant public servants founded in qualified immunity is nonetheless appropriate when the undisputed material facts, or the plaintiff's version of disputed facts, demonstrate that a hypothetical reasonable officer would not have known that his actions, under the circumstances, were objectively unreasonable." *Scott v. Clay Co., Tenn.*, 205 F.3d 867 (6th Cir., 2000) (citing *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902-03 (6th Cir. 1998). "When making a qualified immunity analysis, it is important to remember that the defendant is, in essence, saying: 'If the plaintiff's version is credited, what I did, judged *today, arguendo* would be wrongful, but at the time I acted, no reasonable officer would have known he was acting wrongfully.'" *Kain v. Nesbitt*, 156 F.3d 669,

16

671 (6th Cir.1998) (internal citation omitted) (emphasis in original).

To determine if qualified immunity attaches, the Court must employ the two-part test set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). The Court first must determine whether the alleged facts, taken in a light most favorable to Plaintiff, are sufficient to make out a Constitutional violation. *Id*., at 201. Where the Court determines that a Constitutional violation occurred, "the next, sequential step is to ask whether the right was clearly established." *Id*. With respect to this second inquiry, the Supreme Court has stated:

> The determination as to whether the right was "clearly established" is a determination that "must be undertaken in light of the specific context of the case, not as a broad general proposition." In other words, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*Saucier*, 533 U.S. at 202 (internal citations omitted).

Qualified immunity protects all but the "plainly incompetent" or those who "knowingly violate the law." *Hunter,* 502 U.S. at 229. "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Id*. "If officers of reasonable competence could disagree, immunity should be recognized." *Harlow,* 457 U.S. at 341. The qualified immunity analysis recognizes that reasonable mistakes may be made regarding the legal constraints on particular police conduct. If the officer's mistake is reasonable, then qualified immunity applies. *Saucier*, 533 U.S. at 205-06. Therefore, whether a seizure is unreasonable within the meaning of the Fourth Amendment is an entirely different question from

17

whether Garcia reasonably could have believed that his actions were lawful under the Fourth

Amendment. In *Saucier, supra,* the Supreme Court held:

> The concern of the immunity inquiry is to acknowledge that
> reasonable mistakes can be made as to the legal constraints on
> particular police conduct. It is sometimes difficult for an officer to
> determine how the relevant legal doctrine, here excessive force, will
> apply to the factual situation the officer confronts. An officer might
> correctly perceive all of the relevant facts, but have a mistaken
> understanding as to whether a particular amount of force is legal in
> those circumstances. If the officer's mistake as to what the law
> requires is reasonable, however, the officer is entitled to qualified
> immunity.

*Saucier*, 533 U.S. at 205.

As noted in Section IV.B. above, Plaintiff has set forth sufficient evidence upon which a

Constitutional violation may be found with respect to her claims that her Fourth Amendment rights

were violated when Garcia arrested her for disorderly conduct and searched her apartment. Plaintiff

argues that Garcia is not entitled to qualified immunity because his actions also violate the "clearly

established law" of which a reasonable officer would be aware at the time of the incident. *Jackson

v. Hoylman*, 933 F.2d 401, 402 (6th Cir. 1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814

(1982)). The Sixth Circuit has recognized that a person's right to be free against an unreasonable

search and seizure is a clearly established right for the purposes of qualified immunity analysis. *Pray

v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995).

Defendants assert that even if Garcia's actions were somehow unreasonable, any mistake that

he made in arresting Plaintiff, and subsequently conducting the search, would have been a

reasonable mistake. *Hunter*, 502 U.S. at 229*; Harlow*, 457 U.S. at 341. Defendants argue that

Garcia is still entitled to qualified immunity because Plaintiff cannot demonstrate that any mistake

that Garcia made when arresting Plaintiff and subsequently conducting the search was not a

reasonable mistake.

Plaintiff asserts that Garcia is not entitled to qualified immunity because a genuine issue of material fact exists with respect to whether Garcia (a) unlawfully arrested Plaintiff without probable cause, and then (b) unlawfully searched her apartment without (1) a warrant, (2) her consent, or (3) any other valid reason. Through her Complaint, the deposition testimony, Garcia's deposition testimony and the police reports, Plaintiff has shown that a question of fact exists as to whether Garcia violated a clearly established right in existence at the time of her arrest and the search of her apartment.  If the fact finder agrees with Plaintiff's version, the fact finder could also find that Garcia's conduct violated Plaintiff's clearly established Fourth Amendment right to be secure against unreasonable searches and seizures.

For the reasons set forth above, the Court holds that Garcia is not entitled to qualified immunity with respect to Plaintiff's §1983 claims that her constitutional rights were violated when Garcia used force to arrest her for disorderly conduct and searched her apartment.

**D.      City of Jackson**

A municipal or governmental entity defendant can be found liable for the violation of a constitutionally protected right only if the plaintiff can establish that an officially executed policy, or the toleration of a custom of such municipality or governmental entity leads to, or causes, or results in the deprivation of such rights.  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  Neither *respondeat superior* nor vicarious liability is available as a theory of recovery in a §1983 action. *Monell*, 436 U.S. at 690-91.  In order to have a viable action against the City, Plaintiff must demonstrate that the City itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992).  Therefore, Plaintiff must not only identify the policy, she must connect

19

the policy to the City and show causation between the particular injury and the execution of that

policy. *Garner v. Memphis Police Dept, on remand,* 8 F.3d 358, 364 (6ᵗʰ Cir. 1993).

Inadequate training  can serve as a basis for municipal liability under Section 1983 *only* if

the failure to train amounts to deliberate indifference to the rights of persons with whom the police

came into contact. *Harris*, 489 U.S. at 389. Moreover:

> That a particular officer may be unsatisfactorily trained will not alone
> suffice to fasten liability on the city, for the officer's shortcomings
> may have resulted from factors other than a faulty training program.
> It may be, for example, that an otherwise sound program has
> occasionally been negligently administered. Neither will it suffice to
> prove that an injury or accident could have been avoided if an officer
> had better or more training, sufficient to equip him to avoid the
> particular injury-causing conduct. Such a claim could be made about
> almost any encounter resulting in injury, yet not condemn the
> adequacy of the program to enable officers to respond properly to the
> usual and recurring situations with which they must deal.

*Id.* at 390-91.  "Beyond having to identify 'conduct properly attributable to the municipality' itself,

a plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the

'moving force' behind the injury alleged." *Cherrington v. Skeeter*, 344 F.3d 631, 645 (6ᵗʰ Cir. 2003)

(emphasis in original). "That is, a plaintiff must show that the municipal action was taken with the

requisite degree of culpability and must demonstrate a direct causal link between the municipal

action and the deprivation of federal rights." *Id.,* citing *Board of County Comm'rs of Bryan County

v. Brown*, 520 U.S. 397, 404 (1997).

The "first inquiry in any case alleging municipal liability under §1983 is the question

whether there is a direct causal link between a municipal policy or custom and the alleged

constitutional deprivation." *Harris*, 489 U.S. at 385.  In this case, Plaintiff alleges that the City

"failed to properly train, monitor, direct, discipline and supervise" Garcia. Plaintiff argues that "the

record shows that the Defendant City was aware, or certainly should have been aware, of Garcia's propensity for unlawful and dishonest conduct, yet failed to take corrective action." The Court finds that there is sufficient evidence in the record to support that argument.

As set forth in Plaintiff's Supplemental Brief Motion and in Garcia's personnel file, Garcia has engaged in a number of actions which have resulted in disciplinary actions against him by the City. Such actions include:

(a)   Falsely identifying himself (as another police officer) to a superior officer in 1998, for which Garcia received a written reprimand for violating department rules and regulations regarding truthfulness and conduct unbecoming an officer;

(b)   Disobeying departmental rules by driving a patrol vehicle off the street and onto a sidewalk near a school in April 1999, for which he received a verbal reprimand and was required to review departmental rules, regulations and guidelines;

(c)   Allegations of excessive force and improper service in May 1999; the allegations were "not sustained" but resulted in Garcia being given a memo that counseled him how to handle certain situations;

(d)   Engaging in a physical altercation with a law abiding citizen in May 2000, which altercation began in the Jackson Police Department parking lot at a time when Garcia was not on duty and was under the influence of alcohol; the incident continued (and a second fight occurred) at another location after Garcia followed the citizen when the citizen left the police parking lot; Garcia was given a Memorandum of Disciplinary Notice in August 2000 which contained findings that Garcia engaged in conduct unbecoming and violated his duty to report; Garcia received a 7 day suspension from duty and was ordered to attend a psychological evaluation with the department's psychologist;

(e)   Failing to be evaluated by a departmental psychologist as ordered by the Chief of Police in August 2000; as a result, he was informed in writing that such failure could be considered insubordination and was told that he would have no more chances or opportunities at the department;

(f)   The issuance of an arrest warrant by the Jackson County Prosecutor charging Garcia with assault and battery in the May 2000 incident (Garcia plead no contest to the reduced charge of disorderly conduct), for which he was placed on "administrative non-sworn assignment" status pending the outcome of the criminal case (Garcia eventually received a 3 day suspension without pay); and

21

    (g)     Garcia is currently a defendant in another federal lawsuit wherein it is alleged that, in April 2003, Garcia used excessive force when he broke the wrist of a man he was arresting for a drunk driving infraction.

Significantly, in connection with the incident in May 2000, numerous written notations generated by the Chief of Police were placed in Garcia's file. Such notations included the following:

    (1)     a recommendation by the commanders of the Police Department that Garcia's employment be terminated;

    (2)     a comment that the "charges are serious and I must consider potential civil liability to the department if you are retained and later become involved in a similar incident; and

    (3)     an acknowledgment that Garcia's 2 year employment history prior to the May 2000 incident "does not mitigate discipline in this case."

On the basis of the foregoing, the Court concludes that there is evidence which could support a finding that the City's failure to discipline Garcia more harshly (or even to terminate him, as his commanders recommended) was a causal link in the alleged injury suffered by Plaintiff because they retained an officer with a propensity of violence.

Defendant argues that even if any of the foregoing incidents and actions are relevant to Plaintiff's allegations, Plaintiff cannot overcome the deliberative process privilege. *Ostoin v. Waterford Township Police Dep't,* 189 Mich.App. 334, 471 N.W.2d 666, 668 (1991). The Court disagrees for the reasons set forth above. Specifically, Garcia's supervisors and superiors evaluated his conduct on several occasions, yet arguably did not impose a significant penalty on any occasion, notwithstanding the concerns about civil liability and additional injury to citizens that were advanced by his commanders, including the Chief of Police.

Accordingly, for the reasons set forth above, Defendants' motion for summary judgment on Plaintiff's claim against the City is denied.

**V.  CONCLUSION**

Accordingly, and for the reasons above, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and Plaintiffs' Supplemental Brief Motion is GRANTED.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  August 9, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on August 9, 2006.


s/Marie E. Verlinde
Case Manager
(810) 984-3290